In the
United States Court of Appeals
For the Seventh Circuit

No. 00-2812

Central States, Southeast and Southwest Areas
Pension Fund, a pension trust, and Howard
McDougall, trustee,

Plaintiffs-Appellees,

v.

Gary L. White and Inge T. White,

Defendants-Appellants.

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 99 C 1046--David H. Coar, Judge.

Argued January 26, 2001--Decided July 20, 2001


   Before Bauer, Manion, and Rovner, Circuit
Judges.

   Manion, Circuit Judge.  As part of their
residential property, Gary and Inge White
owned two small apartments over their
garage. Over a period of 32 years they
annually rented the apartments to various
tenants. During that time Gary White
became owner of over 80% of the shares of
a trucking company, which, after several
years of operation, became bankrupt and
ceased doing business. The Central
States, Southeast and Southwest Areas
Pension Fund ("Central States") assessed
substantial withdrawal liability but was
able to collect from the company only a
fraction of the amount owed. After
considerable delay, Central States sued
the Whites for the balance owed. The
district court concluded that the garage
apartment rental activity met the
statutory requirements for the Whites'
liability as common owners under the
Multiemployer Pension Plan Amendments Act
of 1980 ("MPPAA") and held them liable
for $16 million. The Whites appeal, and
we reverse.

I.   BACKGROUND

A.   Apartment Rental

   In anticipation of his marriage to Inge

in June 1969, Gary White purchased a home in downtown Detroit. Inge's name was added to the title in 1973. At the time of the purchase, the home's detached garage had two overhead apartments which the previous owner had rented. Mr. White agreed to honor the lease agreements with the current tenants, and after some discussion with Mrs. White after their marriage, they decided to continue to rent the apartments. At the time Mr. White was self-employed, and because his job required frequent out-of-town travel, they valued the added security of the tenants' presence on the property. Thus, they continued to rent the apartments, primarily to students at nearby Wayne State University, until they sold the property in 1996.

During the time the Whites leased the garage apartments, they deposited rental income into and paid expenses out of joint bank accounts. Typically, Inge showed prospective tenants the apartments and talked to them about rent and availability. Either Inge or Gary handled routine cleaning and maintenance problems, including contacting repair workers and paying the bills.

During the 32 years that they owned the property, the Whites reported income and expenses from the apartment rental on Schedule E, "Supplemental Income and Loss," of their federal income tax return. According to an arrangement with the IRS, common expenses such as mortgage interest, homeowner's insurance, real estate taxes and landscaping, were attributed 5/8 to the Whites' home and 3/8 to the garage apartments. Of particular significance, as will be shown below, the Whites reported rental income from the garage apartments of $4,500 on their 1992 federal income tax return. While this annual income over the years would appear to be a modest financial benefit, in fact it has resulted in an assessment against the Whites in the amount of $16 million. Here's why.

B. Trucking Operation

During the 1970's, Mr. White began working for Ford Motor Company, and in 1986, he served as its Director of Minority Business Development. Seeking to expand Ford's minority supplier program, members of Ford's senior management urged

White to purchase a trucking company, Trans Jones, which owned a subsidiary named Jones Transfer (referred to jointly as "Trans Jones Companies"). Mr. White did purchase the company, and became its CEO. At the time he purchased Jones Transfer, it was subject to collective bargaining agreements with various local Teamsters unions which required it to make contributions to the Central States, Southeast and Southwest Areas Pension Fund on behalf of bargaining unit employees. This business venture turned out to be unsuccessful and the Trans Jones Companies filed for bankruptcy, ultimately going out of business in December 1992. As a result, Central States determined that Jones Transfer had completely withdrawn from the Pension Fund as of December 27, 1992 and assessed its withdrawal liability at that time at approximately $7 million.

Although the Whites contend otherwise, see infra n. 7, in January 1993, Central States allegedly made a demand for payment upon Jones Transfer for withdrawal liability in the amount of $7 million. In March 1993, Central States requested certain financial information from Gary White, including copies of his most recent personal income tax returns. Mr. White provided Central States with the requested information, including his tax returns which, as we have noted, indicated his receipt of rental income from the garage apartments. Central States then engaged in arbitration with the Trans Jones Companies, ultimately receiving approximately $386,000 from the bankruptcy proceeding and $4,300 from a lawsuit against other corporate affiliates of the Trans Jones Companies.

C. Personal Liability for $16 Million

Almost six years after Central States settled with Jones Transfer for its withdrawal liability, Central States filed suit against the Whites, seeking to hold them personally liable for the company's withdrawal liability. In its complaint, Central States alleged that the Whites' garage apartment rental activities constituted a trade or business which, along with Jones Transfer, was under the Whites' common control. Because each employer of a trade or business under common control is jointly and severally liable for the

other's withdrawal liability, Central States contended that the Whites were personally liable for the liability, which had grown to over $16 million./1 The district court agreed with Central States, granting it summary judgment and holding the Whites personally liable for $16 million of withdrawal liability. The Whites appeal.

II.  DISCUSSION

A.  Standard of Review

  Initially, we consider the applicable standard of review. Generally, this court reviews a grant of summary judgment de novo, viewing all of the facts and drawing all reasonable inferences therefrom in favor of the nonmoving party. Oest v. Illinois Dep't of Corrections, 240 F.3d 605, 610 (7th Cir. 2001). Summary judgment is proper when the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).

  Central States would like us to review the district court's decision for clear error, arguing that where the court isreviewing a set of undisputed facts, and is merely applying settled law to those facts, a lower and less stringent standard applies. In support of this position, Central States cites Central States, Southeast & Southwest Areas Pension Fund v. Personnel, Inc., 974 F.2d 789, 792 (7th Cir. 1992), wherein we stated "where we examine[ ] an assessment of withdrawal liability, we review[ ] the district court's conclusions for clear error because the facts were undisputed and the only factual issue was one of characterization." In response, the Whites contend that the facts are disputed, and, in addition, they argue that clear error review is only available if the party opposing summary judgment did not claim a right to a jury trial, which they claim they did./2 They cite Central States, Southeast and Southwest Areas Pension Fund v. Slotky, 956 F.2d 1369, 1373-74 (7th Cir. 1992), and Jurcev v. Central Community Hosp., 7 F.3d 618, 623 (7th Cir. 1993), to support their position. We need not revisit these cases

to determine whether a lower standard of review is appropriate on a review of summary judgment because, as explained below, we conclude that the district court erred on a question of law in interpreting the statute; therefore, our review is necessarily de novo. See Central States, Southeast and Southwest Areas Pension Fund v. Fulkerson, 238 F.3d 891, 894 (7th Cir. 2001).

## B.  Withdrawal Liability

Under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. secs. 1001-1371, as amended by the MPPAA, 29 U.S.C. secs. 1381-1461, an employer who ceases to contribute to a multi-employer pension fund is liable for withdrawal liability. See Central States, Southeast & Southwest Areas Pension Fund v. Ditello, 974 F.2d 887, 888 (7th Cir. 1992). This liability is the employer's proportionate share of "unfunded vested benefits." Id.; 29 U.S.C. sec. 1381. Section 1301(b)(1) of MPPAA provides that "all employees of trades or businesses (whether or not incorporated) which are under common control shall be treated as employed by a single employer and all such trades and businesses as a single employer." 29 U.S.C. sec. 1301(b)(1). Under this section, each business under common control is jointly and severally liable for the withdrawal liability of the others./3 See Ditello, 974 F.2d at 889. To impose withdrawal liability on an organization other than the one originally obligated to the Pension Fund, two conditions must be satisfied: (1) the organization must be under "common control" with the obligated organization and (2) the organization must be a "trade or business." Fulkerson, 238 F.3d at 895.

### 1.  Common control.

Under the statute, "common control" is defined with relation to Internal Revenue Code Section 414(c). See 29 U.S.C. sec. 1301(b)(1). The parties do not dispute that the Whites' rental activities and Jones Transfer are under common control, as defined by the statute and the regulations./4 Instead, they dispute whether the activities need to be economically related to one another in order to be under common control./5 The

Whites argue that requiring an economic nexus furthers ERISA's purpose, which is "to prevent employers from avoiding withdrawal liability by fractionalizing their operations." Personnel, 974 F.2d at 794. This argument certainly has appeal. If an owner sets up other businesses that have similar operations or that perform services that the primary employer uses, such structuring could be exposed as an effort to avoid paying into the pension fund on behalf of employees in those other entities. "[S]ince almost the entire purpose of the [MPPAA] is to prevent the dissipation of assets required to secure vested pension benefits, the use of a controlled nominee to screen assets from creditors is just the sort of device at which the controlled group provision is aimed." Slotky, 956 F.2d at 1374. But what if the commonly owned business has absolutely no connection to the company whose employee pension benefits are at issue?

Until very recently, our case law has been less than clear on this point. Compare Personnel, 974 F.2d at 793 (no economic nexus other than "common control" required), with Ditello, 974 F.2d at 890 (decided weeks after Personnel and finding that "this circuit has never squarely faced the issue of whether businesses must be economically related . . . under section 1301(b)(1)"). However, we have recently confirmed that no such nexus is required in order to im pose liability. See Fulkerson, 238 F.3d at 895 n.1. Accordingly, the district court correctly concluded that the garage rental activity and Jones Transfer were under Mr. White's common control./6

2. Trade or business.

Even though Jones Transfer and the Whites' garage apartment rental activities are under common control, the Whites are not necessarily subject to Jones Transfer's withdrawal liability. Rather, as noted above, we must also examine whether the garage rental activities constitute a "trade or business" for purposes of Section 1301(b)(1). We construe statutory terms according to their ordinary, common meaning unless they are defined by the statute. Fulkerson, 238 F.3d at 895. The MPPAA does not define the phrase "trade or business," and both parties devoted a great deal of their briefs to the

apparent conflict between Personnel and Ditello regarding the appropriate test for determining whether an activity is a trade or business. In Personnel, in interpreting the phrase "trade or business," this court looked to Internal Revenue Code Section 162(a), which allows a taxpayer to deduct expenses incurred in carrying on a trade or business, and to the Supreme Court's decision in Commissioner of Internal Revenue v. Groetzinger, 480 U.S. 23 (1987), interpreting that tax code section. Personnel, 974 F.2d at 794. The Supreme Court stated that "the taxpayer must be involved in the activity with continuity and regularity and that the taxpayer's primary purpose for engaging in the activity must be for income or profit. A sporadic activity, a hobby, or an amusement diversion does not qualify." Groetzinger, at 35 (holding that a taxpayer who spent 60-80 hours per week engaged in gambling activities with a view toward earning a living and who had no other employment operated a trade or business). A few weeks later, however, in Ditello, we stated that, because the tax context is so unique, the Groetzinger test was not the most appropriate test and instead construed the term in light of the purpose of the MPPAA, which is "to prevent dissipation of assets required to secure vested pension benefits." Ditello, 974 F.2d at 890 (citation omitted).

We have recently resolved this dispute and reaffirmed that the Groetzinger test is appropriate for determining whether an activity is a trade or business for purposes of Section 1301(b)(1). Fulkerson, 238 F.3d at 895 (finding that, although the decision involved a specific provision of the tax code, Groetzinger's test is appropriate because it comports with the common meaning of the phrase "trade or business."). Under that test, we consider whether the person engaged in the activity: (1) for the primary purpose of income or profit; and (2) with continuity and regularity. Fulkerson, 238 F.3d at 895. "One purpose of the Groetzinger test is to distinguish trades or business from investments, which . . . cannot form a basis for imputing withdrawal liability under sec. 1301(b)(1)." Id. "The Supreme Court also has ruled that the term does not encompass purely 'personal' activities no matter how 'continuous' or 'extended' the

activity may be nor how profitable . . . ." Groetzinger v. Commissioner of Internal Revenue, 771 F.2d 269, 274 (7th Cir. 1985), aff'd, 480 U.S. 23 (1987) (citing Higgins v. Commissioner, 312 U.S. 212, 216 (1941)).

In Fulkerson, this court had occasion to address the distinction between a trade or business and an investment. The Fulkersons owned a trucking company, Holmes, which went bankrupt and incurred withdrawal liability. Completely separate from their ownership of Holmes, the Fulkersons bought three parcels of land on which Holmes built trucking terminals and subsequently sold them back to Mr. Fulkerson. He then leased the land and terminals, through a triple-net lease (i.e., one in which the tenant incurs many of the obligations of rental such as maintenance, operating expenses, real estate taxes and insurance), to Action, another trucking company owned by his sons (in which Mr. and Mrs. Fulkerson had no interest or participation). According to Mr. Fulkerson, he did not spend more than five hours per year in connection with the properties. His activities consisted of depositing the rent checks, making mortgage payments and reporting the rental income on Schedule E of his federal income tax forms for supplemental income.

Central States sought to impose personal liability on the Fulkersons for Holmes' withdrawal liability, arguing that their rental activity was a trade or business, and together with Holmes, was under their common control. The district court agreed and granted summary judgment to Central States. However, on appeal, applying the Groetzinger test, this court concluded that the district court had erred in relying solely on the Fulkersons' holding of the leases for ten years to support its conclusion that the leasing activity constituted continuous and regular conduct. Rather, we held that "mere ownership of property (as opposed to activities taken with regard to the property) cannot be considered in determining whether conduct is regular or continuous." Id. at 895-96. Central States had argued that the Fulkersons had engaged in such activities "with regard to the property" by selecting the properties, negotiating purchases and negotiating the leases. However, this

court concluded that a reasonable fact-finder could determine that these leases were an investment and that the activity was not sufficiently continuous and regular to constitute a trade or business. Id. at 897. Contrast Personnel, 974 F.2d at 796 (defendant's extensive commercial real estate activities "rose to the level of a trade or business").

Applying the Groetzinger test to determine if the Whites' rental activity is a trade or business, we conclude that it does not rise to such a level. First, it does not appear that the Whites rented their garage apartments for the primary purpose of income or profit. Central States, however, insists that the Whites' primary purpose in renting the apartments was mainly income or profit. Although they certainly realized income and received certain tax benefits from the rentals, the Whites' testimony reflects that an important, if not primary, purpose for renting the apartments was the added security of the tenants' presence. There is no evidence that the apartments were a deciding factor tipping the scales in favor of the Whites' decision to purchase the home. The apartments, and their tenants, predated the Whites' purchase and, initially, the Whites merely agreed to honor the existing tenants' leases. However, we need not resolve this issue (nor remand the case for a factual determination) because, regardless of the Whites' primary purpose, we conclude that their engagement in the rental activities was more akin to purely personal investment, and thus was not sufficiently continuous or regular to constitute a trade or business. See Higgins, 312 U.S. at 216.

In nearly every way, the Whites' conduct resembles that of the Fulkersons, from the manner of depositing rent checks to the tax treatment of the rental income and expenses. While the Whites performed more upkeep, such as maintaining the property and performing routine repairs and cleaning, this involvement is not legally significant. The Whites' garage apartments were appendages of their primary residence. Such normal upkeep benefitted them personally as it maintained the value of their home. Their activities did not benefit a trade or business that could be easily separated from the normal maintenance and upkeep

that every homeowner performs. The Whites simply purchased and cared for their primary residence, which happened to include a garage with two apartments, and lived in it for 32 years. Contrast Personnel, 974 F.2d at 794 (numerous real estate sale and purchase transactions each year); Fulkerson, 238 F.3d at 893 (bought three properties and sold two within 10 years). The Whites' activities, however extensive, in the upkeep and maintenance of their investment in their primary residence were personal in nature, and as such, do not rise to the level of a trade or business.

Central States argues that several factors compel the conclusion that the Whites were engaged in a business: that they obtained actual and substantial tax benefits from renting the property, that they satisfied their mortgage and increased the equity in the property through the rental income, and that they obtained deductions and depreciation. We find these arguments unconvincing. The same such arguments could be made about any other traditional investment activity./7

3.  Fractionalization.

Our conclusion that the Whites' rental activity does not amount to a trade or business furthers Congress' purpose in enacting the statute. "Congress enacted sec. 1301(b) in order to prevent businesses from shirking their ERISA obligations by fractionalizing operations into many separate entities . . . ." Bd. of Trustees of the Western Conference of Teamsters Pension Trust Fund v. H.F. Johnson, Inc., 830 F.2d 1009, 1013 (9th Cir. 1987). Here, the Whites' rental activity has absolutely no possibility of being used to dissipate or fractionalize Jones Transfer's corporate assets and thus avoid withdrawal liability. See Slotky, 956 F.2d at 1374 ("the purpose of limiting controlled group membership to persons engaged in trades or businesses is to protect the owners of corporations from having to dig into their pockets to make good the withdrawal liability of their corporations."); Fulkerson, 238 F.3d at 896 ("[g]iven the prevalence of investing, permitting the holding of investments . . . without more to be considered regular and continuous activity would eviscerate the limitations

placed in the text of sec. 1301(b)(1).").

   Central States' frustration is understandable, but its reaction is not commendable. Because of Jones Transfer's bankruptcy, Central States has incurred what began as $7 million and is now $16 million in unfunded vested pension benefits. They argue the Whites had a separate, commonly owned business that should expose them to personal liability for the company's $16 million debt, a demand that surely would have caused the Whites' personal bankruptcy. A law with the sound purpose of preventing fractionalization should not be stretched to such an extreme application that would expose a common owner of a completely unrelated personal business to such withdrawal liability. The Whites' two apartments did not offend Congress' purpose designed to prevent businesses from shirking their ERISA obligations. In any event, an owner of a business that is obligated to pay contributions to a common pension fund may need to take extra caution in engaging in real estate and other personal investment activities. See Susan C. Glen, "Central States v. Personnel, Inc.: When Real Estate Investments Create Personal Liability under the Multiemployer Pension Plan Amendments Act of 1980," 78 Minn. L. Rev. 501, 524-25 (1993) (finding that the imposition of personal liability may cause the average small business owner to avoid ownership of real property)./8

III.  CONCLUSION

   The Whites' limited rental activities involving their primary residence are personal in nature and do not rise to the level of a "trade or business" for purposes of the MPPAA. Thus, the district court erred in its conclusion that the Whites were personally liable for the Trans Jones Companies' withdrawal liability. Accordingly, we reverse the judgment of the district court and remand for the entry of summary judgment in favor of the Whites.

FOOTNOTES

/1 As of December 31, 1999, the Whites' net worth, including amounts held in tax qualified plans, was approximately $1.4 million.

/2  The district court denied the Whites' jury

demand as moot, given its grant of summary judgment, and the Whites did not appeal this ruling. In their opening brief, they stated that the applicable standard of review was de novo. However, in its response, Central States challenged this statement and the Whites addressed its argument in their reply brief, arguing that they requested, and are entitled to, a jury trial. Central States moved to strike those portions of the reply brief, arguing that the Whites did not address this issue in their initial appellate brief and had waived the argument. However, that portion of the Whites' reply brief, prompted by Central States' standard of review argument in its response brief, necessarily included a consideration of whether the nonmoving party requested a jury trial. Accordingly, it was appropriate for them to first raise it at that point and Central States' Motion to Strike is denied.

/3 In this case, Central States seeks to hold the Whites, as owners of their garage apartments, liable for Jones Transfer's withdrawal liability. We want to be clear that Central States is not claiming, nor may it claim, that the Whites are liable because Mr. White was the majority shareholder of Trans Jones. Generally, controlling shareholders and corporate officers are not employers and therefore may not be personally liable for a company's withdrawal liability in the absence of facts justifying the piercing of the corporate veil under state law. See Levit v. Ingersoll Rand Fin. Corp., 874 F.2d 1186, 1193 (7th Cir. 1989). Such facts are not alleged here. Because the Whites' garage rental activity is not incorporated, but rather operated like a partnership, it offers no shield from personal liability to its owners.

/4 The Whites' rental activities and Jones Transfer qualify as a "brother-sister" group, one in which the same five or fewer people have a controlling interest and over which those same five people exercise effective control. 26 C.F.R. sec. 1.414(c)-2(c). A "controlling interest" in a corporation is ownership of at least 80% of the voting shares and, in a partnership, it is ownership of at least 80% of the profits, interest or capital interest. See 26 C.F.R. sec. 1.414(c)-2(b)(2). "Effective control" is demonstrated by ownership of at least 50% of the combined voting power of all the voting stock of a corporation and by ownership of at least 50% of the profits, interest or capital interest of a partnership. See 26 C.F.R. sec. 1.414(c)-2(c)(2). Here, all of the stock of Jones Transfer, the entity incurring withdrawal liability, was owned by Trans Jones, 93.53% of the stock of which was owned by Mr. White. His interest therein is attributed to his wife. See 26 C.F.R. sec.

1.414(c)-4(b)(5)(i). Since the Whites owned 100% of their garage rental activity (i.e., their home), the leasing activity and the Trans Jones Companies are under "common control."

/5 It is undisputed that the Whites never rented the apartments to anyone working for or connected with Trans Jones or Jones Transfer and that those companies never engaged in any business transactions with the Whites personally, nor did the companies ever provide them with any money or thing of value for use in the rental of the apartments.

/6 We note the irony, however, that while courts have typically held that the businesses do not have to be "related," most of the cases involved a business which leased property to the business incurring withdrawal liability. See Slotky, 956 F.2d 1369 (7th Cir. 1992); Central States, Southeast and Southwest Areas Pension Fund v. Koder, 969 F.2d 451 (7th Cir. 1992); Personnel, 974 F.2d 789 (7th Cir. 1992); Ditello, 974 F.2d 887 (7th Cir. 1992); Bd. of Trustees of the Western Conference of Teamsters Pension Trust Fund v. LaFrenz, 837 F.2d 892 (9th Cir. 1988). In addition, as explained in more detail below, in Fulkerson, the trucking company (which had incurred withdrawal liability and of which Mr. Fulkerson was an owner) originally built trucking terminals on Mr. Fulkerson's land and subsequently sold them to him. Mr. Fulkerson continued to use the land as rental property. Technically the trucking company and Mr. Fulkerson's leasing activity were not related, but nevertheless there was some connection. Here, no such connection exists.

/7 The Whites also argue that there are genuine issues of material fact regarding whether the Trans Jones Companies received Central States' notice and demand of payment of withdrawal liability, whether they were actually engaged in rental activities on December 27, 1992, regarding their intent (for profit or otherwise) in renting the apartments, and whether Mrs. White intended to join her husband in the rental activity. Even assuming that these questions were resolved in Central States' favor, we would still conclude that the Whites' activities do not constitute a trade or business for purposes of Section 1301(b)(1). Accordingly, we need not address whether these additional issues should also have precluded summary judgment.

/8 In addition to their statutory arguments, the Whites have urged us to determine whether the imposition of personal liability for $16 million in withdrawal liability based on their rental income of approximately $5,000 per year consti-

tutes a violation of their rights under the Due Process and Taking Clauses of the Fifth Amendment. However, given our holding regarding the interpretation of the MPPAA, we need not reach their constitutional arguments. See United States v. Bloom, 149 F.3d 649, 653 (7th Cir. 1998). Likewise, we need not decide whether, because Central States waited six years to file suit (while $9 million in liability accumulated), laches should apply to its claim.