In the

# United States Court of Appeals
## For the Seventh Circuit

No. 01-2034

BRIAN WHITE and QUENTIN MCCLINTON,

*Plaintiffs-Appellants,*

v.

CITY OF MARKHAM, ERIK LYMORE, MARKHAM
CHIEF OF POLICE, OFFICER MULDROW, MARKHAM
POLICE, STAR #525, and CLAUDETTE BROOKS WITCHER,

*Defendants-Appellees.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 99 C 3162—**James B. Zagel**, *Judge.*

ARGUED FEBRUARY 13, 2002—DECIDED NOVEMBER 13, 2002

Before COFFEY, MANION, and WILLIAMS, *Circuit Judges.*

MANION, *Circuit Judge.* Brian White and his son Quentin McClinton lived in a house owned by Brian's aunt, Claudette Brooks Witcher, under an oral agreement. During a verbal altercation with his aunt, White called the police for assistance. Officer Kenneth Muldrow of the Markham Police Department arrived on the scene and, after determining that Witcher was the owner of the residence, requested that White vacate the premises or face

arrest. White and his son left the house and subsequently filed suit against the City of Markham, Officer Muldrow, Markham Chief of Police Eric Lymore and Witcher, alleging that they violated his Fourth Amendment right to be secure against unreasonable seizures, in violation of 42 U.S.C. § 1983. White also asserted state law claims of wrongful eviction and breach of quiet enjoyment. The district court dismissed the claims against the officers under a grant of qualified immunity and granted summary judgment to all defendants, finding that Officer Muldrow's actions were reasonable. White appeals the district court's judgments and we affirm.

## Background

In 1999, Brian White and his son Quentin McClinton lived in a home owned by White's aunt, Claudette Witcher. White began living in the house, along with his mother and brothers, in January 1998 after a fire damaged their home. The extended family stayed in Witcher's home under a four-month written lease during the spring of 1998. At the expiration of the lease, White's mother and brothers moved out but White remained and was later joined by his son. They did not have a written lease to stay in the house, but instead had an oral agreement with Witcher, who did not live in the home, that White would perform chores, pay some of the utility bills, and protect the property in return for living there rent-free. They also agreed that White and his son would move out sometime after April 1, 1999 because Witcher was planning on remodeling the home. However, Witcher began to remodel her home prior to April 1. The construction project impacted several areas of the house including areas frequently used by White and his son. Interior walls were knocked out, the ceiling in one room was removed, and

at least one wall connecting the interior of the house to the garage had a hole in it covered only by plastic.

On the morning of March 8, 1999, Witcher went to her house and told White and his son that they were no longer welcome to stay. A verbal altercation between the parties ensued and Witcher started throwing their belongings around the house. White called the Markham Police Department for assistance and Officer Kenneth Muldrow responded to the call. When Officer Muldrow arrived, he discovered broken lamps and other personal belongings scattered on the living room floor along with White's shattered fish tank. Witcher and White continued to argue and both asked Officer Muldrow to remove the other from the premises.

Officer Muldrow spoke with both of them about the condition of the house and called a building inspector, but learned that the inspector could not come to the house at that time. Officer Muldrow eventually determined that Witcher was the owner of the property and told White, while placing a hand on White's shoulder, that if he did not leave immediately, he would be arrested. White stated that he did not want to leave, and instead asked Officer Muldrow to talk to Dwight Levert, his attorney. Officer Muldrow declined to speak to Levert and repeated his threat to arrest White if he did not leave the premises. During this time, Witcher continued to yell at White and started throwing his personal belongings out of the house. After repeated threats of arrest, White and McClinton eventually took their personal belongings and left the house. Levert then called Markham Chief of Police Eric Lymore and asked him to intervene in the situation. Chief Lymore spoke to Levert about the situation but declined to intervene, stating that he would talk to Officer Muldrow later in the day to get his version of the events.

In May 1999 White and McClinton (hereinafter "plaintiffs") filed a five-count complaint seeking damages pursuant to 42 U.S.C. § 1983, alleging a deprivation of their rights secured by the Fourth Amendment. They also sought damages for violations of state law including wrongful eviction and breach of quiet enjoyment. The complaint named the City of Markham, Chief Eric Lymore, and police officer Ken Muldrow, as well as their aunt, Claudette Witcher, as defendants. In November 1999, the district court dismissed all state law claims filed against the City, Lymore and Muldrow, and the federal claims against Lymore and Muldrow, finding they were entitled to qualified immunity. The court then granted summary judgment in favor of all defendants in October 2000. White appeals both decisions.

## Analysis

On appeal, the plaintiffs argue that the district court incorrectly ruled that the police officers who seized them were entitled to qualified immunity. They contend that it was well-established in March 1999 that forcing a family out of their home under threat of immediate arrest constituted an unconstitutional seizure under the Fourth Amendment. The plaintiffs also argue that the district court erred in granting the defendants summary judgment because of the existence of contested issues of material fact. Finally they argue that the grant of summary judgment was flawed because it was based upon the erroneous conclusion that a police officer acts lawfully if he participates in an illegal eviction when a property owner requests assistance in expelling non-owner residents.

**A. Qualified Immunity**

The plaintiffs contend that the district court erred in dismissing the claims against Officer Muldrow and Chief Lymore based on qualified immunity. This court reviews the grant of a motion to dismiss *de novo*, accepting all of the well-pleaded factual allegations contained in the plaintiff's complaint as true and drawing all inferences in favor of the complainant. *See Crenshaw v. Baynerd*, 180 F.3d 866, 868 (7th Cir. 1999). We shall affirm the district court's dismissal of the complaint only if it appears beyond doubt that the plaintiffs cannot prove any set of facts that would entitle them to relief. *See, e.g., Conley v. Gibson*, 355 U.S. 41, 45-46 (1957); *Crenshaw*, 180 F.3d at 868.

The threshold inquiry in a qualified immunity analysis is whether the plaintiff's allegations, if true, establish a constitutional violation. *See Saucier v. Katz*, 533 U.S. 194, 201 (2001). If a violation can be made out based on the plaintiff's allegations, a court should then inquire as to whether the right was clearly established. *See id.* As the Court explained in *Saucier*, qualified immunity operates "to ensure that before they are subjected to suit, officers are on notice their conduct is unlawful." *Saucier*, 533 U.S. at 206. Thus, for a constitutional right to be clearly established, "its contours 'must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful . . . but it is to say that in the light of pre-existing law the unlawfulness must be apparent.' " *See Hope v. Pelzer*, 122 S.Ct. 2508, 2515 (2002) (internal quotations and citations omitted). Accordingly, in this case we must first determine if, assuming the facts alleged in the complaint are true, Officer Muldrow violated the plaintiffs' Fourth

Amendment rights by threatening him with arrest if he did not leave the premises, and if Chief Lymore violated the plaintiffs' rights by failing to intervene in the situation. If so, we must then determine whether the state of the law at the time of the alleged events at issue gave them a fair warning that their treatment of the plaintiffs was unconstitutional. *See id.* The plaintiffs bear the burden of establishing the existence of a clearly established constitutional right. *See Rakovich v. Wade*, 850 F.2d 1180, 1209 (7th Cir. 1988).

The Fourth Amendment provides that the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. Const. Amend. IV. Its "central requirement" is one of reasonableness. *See Texas v. Brown*, 460 U.S. 730, 739 (1983). Therefore, to state a constitutional violation, the defendants must allege (1) Officer Muldrow's conduct constituted a "seizure," and (2) the seizure, if one occurred, was "unreasonable." *Kernats v. O'Sullivan*, 35 F.3d 1171, 1177 (7th Cir. 1994); *Donovan v. City of Milwaukee*, 17 F.3d 944, 948 (7th Cir. 1994).

In this case the plaintiffs claim that they were the subject of an unreasonable seizure because Officer Muldrow and Chief Lymore, operating under an illegal policy of Markham County, prevented them from staying in their home under threat of arrest. The plaintiffs present an interesting inversion of a theory of Fourth Amendment liability because they were free to leave at any time. White did in fact eventually leave the site of the altercation when he and his son packed up their belongings and left the house. In *United States v. Mendenhall*, 446 U.S. 544, 554 (1980), the Supreme Court stated the test for a seizure as follows: "[a] person has been 'seized' within the meaning of the Fourth Amendment only if, in view of all the cir-

cumstances surrounding the incident, a reasonable person would have believed that he was not *free to leave.*" (Emphasis supplied.) White is not alleging that he was not "free to leave," but rather that he was not free to stay. In *Florida v. Bostick*, 501 U.S. 429, 436-37 (1991), the Court found the "free to leave" analysis inapplicable to a factual scenario involving the questioning of passengers aboard a bus because leaving the bus before it reached the passengers' destination was not a reasonable alternative. In that case the Court described a more appropriate test for a seizure would be "whether a reasonable person would feel free to decline the officer's requests or otherwise terminate the encounter." *Id.* at 436. In analyzing a situation where a suspect was restricted in some manner, but did not attempt to leave, the Supreme Court has identified a number of factors that might suggest that a seizure has occurred, including: the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled. *See Mendenhall*, 446 U.S. at 554.

This is not the first time that we have examined this unusual theory of unreasonable seizure under the Fourth Amendment. In *Spiegel v. City of Chicago*, 106 F.3d 209, 210 (7th Cir. 1997), we addressed the issue of seizure when officers prevented a former tenant from entering his former apartment, by then in possession of the landlord. In that case, Spiegel, who returned to his apartment after he had been evicted through a court order, was ordered by the police not to go to or into his former residence under threat of immediate arrest. *Id.* Of course he could not enter his apartment in any event because the locks had been changed. *See id.* at 211. In *Spiegel* we did not decide whether or not a seizure had in fact occurred,

but ruled that qualified immunity attached due to the fact that the former tenant's "right not to have the police prevent him from entering an apartment that was in the possession of the landlord was not clearly established at the time the police blocked his attempt to enter." *Id.* at 212.

A similar theory was also presented in *Kernats v. O'Sullivan*, 35 F.3d 1171 (7th Cir. 1994), where a landlord obtained an order of possession from a state court and ordered the tenants to leave the premises. *See id.* at 1173. When they failed to leave, the landlord asked the local police to cite the tenants for trespassing and a police officer (O'Sullivan) came to the property and ordered the tenants to leave by the end of the day or face arrest. *See id.* at 1174. The tenants complied, apparently fearing arrest, and subsequently filed a § 1983 suit alleging that O'Sullivan unreasonably seized them when he ordered them to leave. *See id.* In that case, the district court found no seizure and dismissed the suit, but on appeal the court divided three ways and could not agree on whether the tenants were seized. *See id.* at 1183-86.

While *Spiegel and Kernats* presented a similar Fourth Amendment theory, this court has yet to resolve the issue of whether a seizure occurs when police, by threatening arrest, prevent a current or former resident from remaining on their premises. Of course, the resident was free to travel anywhere else. Similar to the plaintiffs in *Kernats*, White was in actual possession of the premises when he was asked to depart by the police, but unlike those plaintiffs White was not staying in the house under a written lease.[1] Additionally, unlike Kernats, who had several hours

---

[1] Despite White's quasi-tenant status, his possession of the property and intent to stay there indicates that Witcher's house
(continued...)

to get out or face arrest, White alleges that he faced the immediate threat of arrest if he did not comply with the police order. Similar to *Spiegel*, White faced additional impediments to his possession of the premises outside of the threat of arrest, namely his aunt's vigorously expressed desire not to have him stay as her guest any longer. It was White himself, after all, who called the police in an apparent effort to stop his aunt's actions.

Alternatively, White argues that he was seized pursuant to our holding in *United States v. Jerez*, 108 F.3d 684, 691-92 (7th Cir. 1997), where we applied the "free to terminate the encounter" test from *Bostick* (as opposed to the "free to leave" test from *Mendenhall*) in a finding that a seizure occurred when officers surrounded a suspect's hotel room, shone a light through the window and banged on the door in the middle of the night. In *Jerez*, we found that under the totality of the circumstances, a seizure had occurred because the plaintiff was confined in his hotel room by the police and was therefore coerced to open his door and face police questioning. *See id.* at 691-92. This case presents a legally different scenario from *Jerez*, however, because White was not trapped inside a home by uninvited police officers and then coerced to open the door, but instead was asked to leave his home by a

---

[1] (...continued)
was his "home" under Illinois law for Fourth Amendment purposes. *See People v. White*, 512 N.E.2d 677, 681 (Ill. 1987) (" 'If a suspect has been living in a particular dwelling for any significant period, say a few days, it can certainly be considered his 'home' for Fourth Amendment purposes, even if the premises are owned by a third party and others are living there, and even if the suspect concurrently maintains a residence elsewhere as well.' " (citing *Steagald v. United States*, 451 U.S. 204, 230-31 (1981) (Rehnquist, J., dissenting))).

police officer whom he himself had called to the premises. If Officer Muldrow had, in fact, arrested White and taken him to the police station and detained him there for investigative purposes, it is indisputable that a seizure would have occurred. *See Hayes v. Florida*, 470 U.S. 811, 816 (1985) ("[O]ur view continues to be that the line is crossed when the police, without probable cause or a warrant, forcibly remove a person from his home or other place in which he is entitled to be and transport him to the police station, where he is detained, although briefly, for investigative purposes.").

However, based on the facts alleged in the complaint, it is clear that White was not "free to terminate the encounter." Additionally, based on Officer Muldrow's slight touching of White combined with the threat of immediate arrest if White did not comply with his order, it is apparent that White felt compelled to comply with Officer Muldrow's commands or face the consequences. *See Mendenhall*, 446 U.S. at 554. However, under this factual scenario, when the plaintiffs were free to leave and thereby terminate the encounter at any time it is unclear whether a seizure occurred. We do not need to answer that question because in this case, even if the plaintiffs' encounter with Officer Muldrow could be labeled a seizure, the "seizure" was reasonable.

In cases such as this, where a traditional analysis of seizure "yields no answer, the Court must evaluate the search or seizure under traditional reasonableness standards by balancing an individual's privacy interests against legitimate governmental interests." *Wyoming v. Houghton*, 526 U.S. 295, 299-300 (1999) (citing *Vernonia School Dist. 47J v. Acton*, 515 U.S. 646, 652-53 (1995)). Whether or not a seizure is reasonable under this balancing act is determined by examining the totality of the

circumstances. *See, e.g., Illinois v. McArthur*, 531 U.S. 326, 331-34 (2001) (holding that preventing a man from entering his own home without officers accompanying him while they waited for a search warrant did not violate the Fourth Amendment as it was a reasonable seizure under the totality of the circumstances); *United States v. Swift*, 220 F.3d 502, 506 (7th Cir. 2000). Based on the allegations contained in White's complaint it is clear that he has not suffered an unreasonable seizure as a matter of law. Unlike the suspects in *Jerez* who, having paid for their hotel room had valid occupancy, or the litigants in *Kernats* and *Spiegel* who at some point had a written lease to their property, White's allegations of a right to remain on Witcher's property, in the face of her demand that he leave, are tenuous at best. In his complaint he states that he was permitted to stay at his aunt's house until construction began on the premises and in exchange he would perform some chores, safeguard the house against vandalism, and pay some utility bills. He does not allege that a written lease existed, or that he paid rent, but only that Witcher agreed to let him and his son stay at the house until the construction started on April 1, 1999. Obviously, she was unhappy with that arrangement by March 9, 1999, when construction had already begun, and expressed that unhappiness by returning to her home and demanding his departure. The altercation was serious enough that White's personal property had been broken and strewn around the house, causing White himself to call Officer Muldrow to the premises to intervene as a "peace officer." *See* Ill. Comp. Stat., ch. 65, § 5/11-1-2(a) (1998) ("Police officers in municipalities shall be conservators of the peace."). *See also City of Chicago v. Morales*, 527 U.S. 41, 106-07 (1999) (Thomas, J., dissenting) ("Police officers are not, and have never been, simply enforcers of the criminal law. They wear other hats—importantly, they

have long been vested with the responsibility for preserving the public peace.") (citing O. Allen, *Duties and Liabilities of Sheriffs* 59 (1845) ("As the principal conservator of the peace in his county, and as the calm but irresistible minister of the law, the duty of the Sheriff is no less important than his authority is great.")).

When Officer Muldrow arrived he was faced with a domestic disturbance and in order to restore peace to the situation, he was forced to ask either Witcher, the admitted nonresident homeowner, or White, her relative and resident guest, to leave the premises. Based on this unique situation, it could not have been unreasonable for Officer Muldrow to request White, the family member with the apparently inferior property interest in remaining on the premises, to vacate the explosive situation. Afterwards, when all of the facts were clear, it may have been that Officer Muldrow was incorrect in that conclusion, but a police officer cannot be expected to make that determination when lamps are flying and family members are shouting at each other. Nor was it unreasonable to use the threat of arrest to accomplish this goal. *See Schlessinger v. Salimes*, 100 F.3d 519, 523 (7th Cir. 1996) (holding that it was reasonable, and therefore not a Fourth Amendment violation, for an officer to threaten arrest in order to stop a restaurant patron's disorderly conduct). In fact, based on White's own contention that "a citizen who is forced out of his home has his liberty restrained," Officer Muldrow could have been violating Witcher's Fourth Amendment rights if he had asked her to leave her own house or face the possibility of arrest. In conclusion, we find that Officer Muldrow's actions were not unreasonable, even if they did constitute a seizure, under the totality of the circumstances in this unique situation. Chief Lymore's failure to intervene in the situation was similarly not unreasonable.

In any event, even if we were to determine that an unreasonable seizure may have occurred, which we do not, it was not clearly established that Officer Muldrow's action on that day constituted a constitutional violation. Given this uncertainty we could not expect an officer with even a detailed knowledge of the holdings in *Kernats* and *Spiegel*, much less a reasonable person,[2] to have had a fair warning that White had a right superior to that of his aunt to remain on the premises. He could not have known that asking White to leave under threat of arrest would constitute an unreasonable seizure. Nor does White point to any case law where such a scenario or even a similar scenario was held to be a seizure. Therefore, because Officer Muldrow and Chief Lymore did not have a "fair warning" that Officer Muldrow's actions were unconstitutional, and because the eviction was not unreasonable under these circumstances, the district court correctly granted Officer Muldrow and Chief Lymore qualified immunity.

**B.  Summary Judgment Motion**

We now turn to the district court's grant of summary judgment for the City of Markham and Claudette Witcher. The district court granted summary judgment to the defendants, holding that the removal of White from his home was reasonable and therefore not a violation of the Fourth Amendment. In arriving at this conclusion, the court

---

[2]  "[G]overnmental officials performing discretionary functions are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a *reasonable person* would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982) (emphasis added); *see also Elder v. Holloway*, 510 U.S. 510 (1994).

considered both the state of disrepair of the home as well as the intensity of the dispute between White and his aunt. Additionally the court held that, to the extent that White alleged that the City of Markham had a policy in place whereby the police would remove a tenant based on the request of a landlord, that policy did not influence Officer Muldrow's actions. White argues on appeal that the district court erred in basing its decision on its determination that Officer Muldrow's motivation in forcing White from Witcher's home was the allegedly uninhabitable condition of the premises, because the state of the house was a sharply disputed issue. Also White argues that the district court erred in holding that Officer Muldrow's motivation behind his eviction—that Witcher was the owner of the house and that she wanted the plaintiffs out— was a lawful motivation, thus rendering the seizure reasonable.[3]

We review a grant of summary judgment de novo, viewing all of the facts, and drawing all reasonable inferences therefrom, in favor of the nonmoving party. *See Central States, Southeast and Southwest Areas Pension Fund v. White*, 258 F.3d 636, 639 (7th Cir. 2001). Summary judgment is proper if the record shows that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. *Cengr v. Fusibond Piping Sys., Inc.*, 135 F.3d 445, 450 (7th Cir. 1998) (quoting Fed.R.Civ.P. 56(c)).To state a claim under

---

[3] White does not challenge the finding of summary judgment in favor of Claudette Witcher on appeal and has therefore waived those arguments. *See, e.g., United States v. Feinberg*, 89 F.3d 333, 340 (7th Cir. 1996) ("Any issues or arguments of which the appellate may wish to avail himself are forfeited unless proffered in the appellate brief.").

§ 1983, the moving party must demonstrate that the defendant deprived him of a right secured by the Constitution and that in doing so the defendant acted under color of state law. *Stagman v. Ryan*, 176 F.3d 986, 999 (7th Cir. 1997).

It is well-settled that the City of Markham cannot be liable for the actions of its agents through a theory of *respondeat superior. See Monell v. Dep't of Social Servs.*, 436 U.S. 658, 691 (1978). Rather, "it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983." *Id.* at 694. Therefore, to maintain a § 1983 claim against the City of Markham, White must establish both "the requisite culpability (a 'policy or custom' attributable to municipal policy-makers), and the requisite causation (the policy or custom was the 'moving force' behind the constitutional deprivation)." *Gable v. City of Chicago*, 296 F.3d 531, 537 (2002) (*citing Monell* at 436 U.S. at 691-94).

White has not presented sufficient facts to meet either standard. First, while White alleged the existence of a policy or custom of evicting tenants at the landlord's request at the district court level, he does not make that argument on appeal and therefore it is waived. *See Gable* at 538. Second, to the extent there was any policy in place, White has not established a constitutional deprivation that resulted from that policy because he was not, in fact, deprived of his rights under the Fourth Amendment, as his alleged seizure was reasonable.

The reasonableness of Officer Muldrow's actions in asking White to leave the home comes into even clearer focus when the state of the home at the time of the incident is considered. Based on just those facts that White ad-

mits without dispute, the house was clearly under significant construction at the time of his altercation with Witcher. Interior walls had holes in them, a wall connecting the interior of the house to the exterior was covered only by plastic, leftover construction materials were on the floor in the interior of the house and a ceiling had been removed in one room. Furthermore, construction had spread into areas of the house where White and his son were residing. In the face of this construction, Officer Muldrow tried to get a building inspector to come to the premises due to the possible uninhabitability of the house. Therefore, for both health and safety reasons, the most reasonable course of action was to remove White and his son from the house. Because White cannot establish either a deprivation of a constitutional right, or a policy that led to an alleged deprivation, the district court correctly granted summary judgment to the City of Markham and Chief Lymore.

## Conclusion

The district court properly found that Officer Muldrow and Chief Lymore were entitled to qualified immunity because, even assuming White had been seized, at the time that White was directed to leave the premises the alleged acts were not clearly established to constitute a constitutional violation. Additionally we find that the district court properly granted summary judgment to the remaining defendants because the actions of the officers were reasonable under the totality of the circumstances. Therefore we AFFIRM the decisions of the district court granting the defendants' motion to dismiss and motion for summary judgment.

No. 01-2034                                                    17

A true Copy:

      Teste:

_____

*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*
