CENTRAL STATES, SOUTHEAST and SOUTHWEST PENSION FUND, a Pension Trust, and Marion M. Winstead, Robert C. Sansone, Robert J. Baker, Howard McDougall, Arthur H. Bunte, Jr., R. Jerry Cook, R.V. Pulliam, Sr. and Harold D. Leu, the present Trustees, Plaintiffs–Appellants,

v.

PERSONNEL, INC., a Wisconsin corporation, and Eugene Perrelle, Defendants–Appellees.

No. 91–2392.

United States Court of Appeals, Seventh Circuit.

Argued Feb. 18, 1992.

Decided Aug. 20, 1992.

Terence G. Craig, Neal S. Deodhar (argued), Timothy J. Frenzer, Central States, Southeast & Southwest Area Pension Fund, Law Dept., Rosemont, Ill., for plaintiffs-appellants.

Paul V. Esposito, Douglas A. Lindsay, Lewis, Overbeck & Furman, Chicago, Ill., Charles P. Stevens (argued), Lindner & Marsack, Milwaukee, Wis., for defendants-appellees.

Before POSNER and KANNE, Circuit Judges, and VAN SICKLE, Senior District Judge.*

KANNE, Circuit Judge.

Under the Multiemployer Pension Plan Amendments Act ("MPPAA"), 29 U.S.C. §§ 1381 *et seq.*, an employer which withdraws from a multi-employer pension plan is liable for its pro rata share of the plan's unfunded vested liability. *See* 29 U.S.C. § 1381. Central States, Southeast and Southwest Areas Pension Fund ("the Fund") brought this action against Personnel, Inc., a Wisconsin corporation, and Eugene Perrelle, the sole owner and president of Personnel, to collect withdrawal liability owed by Personnel. The Fund seeks to impose withdrawal liability on Perrelle because Personnel has ceased operations and has no assets.

Congress enacted the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §§ 1001 *et seq.*, to protect employees' pension rights. However, ERISA did not include liability provisions which would apply when an employer withdrew from a multi-employer pension plan. This meant that no provision ensured compensation to cover the shortfall in contributions to the fund whenever an employer withdrew. Congress established withdrawal liability in the MPPAA to ensure that when an employer withdraws from a pension plan, the financial burden of its employees' vested pension benefits would not be borne by the other employers in the plan. *See Central States, Southeast and Southwest Areas Pension Fund v. Slotky*, 956 F.2d 1369, 1371 (7th Cir.1992); *Trustees of Chicago Tr. Drivers P.F. v. Central Transp.*, 888 F.2d 1161, 1165 (7th Cir.1990).

I.

Between 1963 and 1987, Perrelle owned and operated Personnel, which leased truck drivers to other firms. Pursuant to its collective bargaining agreements with Local 43 of the Teamsters Union, Personnel was required to make contributions to the Fund.

While he was president of Personnel, Perrelle invested portions of his savings in real estate. Some of Perrelle's properties were apartment buildings leased to tenants on a month-to-month basis. The investments yielded negligible current profits, and often had negative cash flow. Perrelle also purchased several properties and held them for short periods, and was able to sell some of the properties at a gain.

For the most part, Perrelle's real estate investments were unrelated to Personnel. From 1980 until 1985, however, Personnel's offices were in a building owned by Perrelle, who received rent from Personnel. In 1985, Personnel stopped paying rent to Perrelle when Perrelle moved the company's offices into his own home.

After the deregulation of the trucking industry in the mid–1980s, Personnel found it difficult to compete and began to lose money. Between 1985 and 1987, Personnel had significantly reduced its employees and had reduced its contributions to the Fund. By the summer of 1987, Personnel employed no one and had ceased operations.

On December 31, 1986, the Fund determined that Personnel had effected a "partial withdrawal" within the meaning of 29 U.S.C. § 1385(a)(1). On April 15, 1988, the Fund mailed to Personnel a notice and demand for payment of withdrawal liability in the amount of $283,165.30. The Fund also directed Personnel to send copies of its federal corporate tax returns to the Fund and also requested Perrelle to send copies of his individual income tax returns. Personnel and Perrelle complied with the Fund's requests for copies of the tax returns, but did not pay the withdrawal liability.

On December 1, 1988, the Fund informed Perrelle that it had determined that he was an employer within the meaning of 29 U.S.C. § 1301(b)(1), and that in addition to his business activities with Personnel, Per-

---

* The Honorable Bruce M. Van Sickle, Senior District Judge for the District of North Dakota, is sitting by designation.

relle's real estate activities constituted a trade or business. Accordingly, the Fund found that Perrelle was personally responsible for the withdrawal liability incurred by Personnel. The Fund brought this action to compel payment of the withdrawal liability.[1]

After discovery was completed, both parties moved for summary judgment. In a memorandum opinion, the district judge held that Perrelle's real estate holdings did not rise to the level of a trade or business under § 1301(b)(1), and entered summary judgment in favor of Perrelle and against the Fund. In so ruling, the district court reasoned that because Perrelle's real estate activities were largely unrelated to the activities of Personnel, those activities could not be deemed a trade or business. The district court also found that Perrelle's investments were purely personal, and therefore did not rise to the level of a trade or business. The Fund appeals.

## II.

■ We must first determine the appropriate standard of review. We review *de novo* a grant or denial of summary judgment. *Carston v. The County of Cook*, 962 F.2d 749, 751 (7th Cir.1992); *Pro–Eco, Inc. v. Board of Commissioners of Jay County, Ind.*, 956 F.2d 635, 637 (7th Cir.1992). Summary judgment is appropriate if we can determine that "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *Carston*, at 751. In reviewing a grant of summary judgment we "view the record and all inferences drawn from it in the light most favorable to the party opposing the motion." *Carston*, at 751 (quoting *Lohorn v. Michal*, 913 F.2d 327, 331 (7th Cir.1990)). Nevertheless, in *Slotky*, where we examined an assessment of withdrawal liability, we reviewed the district court's conclusions for clear error because the facts were undisputed and the only factual

issue was one of characterization. 956 F.2d at 1373–74. Because that is also the case here, we will review for clear error.

■ Personnel and Perrelle have not challenged the Fund's right to assess withdrawal liability, and they do not challenge the amount of liability assessed. The only question remaining is whether withdrawal liability may properly be imputed to Perrelle under § 1301(b)(1). Section 1301(b)(1) provides that "all employees of trades or businesses (whether or not incorporated) which are under common control shall be treated as employed by a single employer and all such trades and businesses as a single employer." *See Western Conference of Teamsters Pension Trust Fund v. Lafrenz*, 837 F.2d 892, 893 (9th Cir.1988) (under § 1301(b)(1) each business under common control is jointly and severally liable for the withdrawal of another such business); *see also Central States, Southeast and Southwest Areas Pension Fund v. Koder*, 969 F.2d 451, 452 (7th Cir.1992) *Central States, et al. v. Chatham Properties*, 929 F.2d 260, 264 (6th Cir.1991). There are two requirements to establish a "single employer": 1) the entities involved must be "trades or businesses," and 2) they must be under "common control." *Lafrenz*, 837 F.2d at 893–94.

There is no doubt that Personnel and Perrelle's real estate activities are under Perrelle's "common control." IRS regulations define "trades or businesses under common control" to include "brother-sister" groups. 26 C.F.R. § 1.414(c)–2; *see also Lafrenz*, 837 F.2d at 893. The regulations define a "brother-sister" group as a group of two or more organizations in which the same five or fewer people have a "controlling interest" and over which those same five people exercise "effective control." *See* 26 C.F.R. § 1.414(c)–2(c). A "controlling interest" in a corporation is ownership of at least 80% of the voting shares; and, in the case of a sole proprietorship, it is complete ownership of the

---

1. 29 U.S.C. § 1401(a)(1) requires that all disputes between the employer and the plan be resolved by arbitration. Although Perrelle failed to request arbitration, this dispute is prop-

erly before the court because Perrelle argues that he was not an "employer" within the meaning of the statute. *See* § 1301(b)(1).

business. *See* 26 C.F.R. § 1.414(c)–2(b)(2)(A) and (D). "Effective control" is demonstrated by ownership of at least 50% of the combined voting power of all the voting stock of a corporation, or complete ownership of a sole proprietorship. *See* 26 C.F.R. § 1.414(c)–2(c)(2)(i) and (iv).

█ The Fund is correct that the "brother-sister" group of businesses consists of a corporation, Personnel, and a sole proprietorship, Perrelle's real estate activities. We agree with the district court's determination that the "common control" requirements were met in this case because Perrelle owned 100% of Personnel and was the sole proprietor of his real estate activities on the date of withdrawal.[2] Therefore, if Perrelle's real estate activities are properly termed a trade or business, they will be deemed under common control and Perrelle will be liable for the withdrawal liability. *See Lafrenz*, 837 F.2d at 893; *Central States, Southeast and Southwest Areas Pension Fund v. Long*, 687 F.Supp. 298, 300–01 (E.D.Mich.1987).

Initially, we examine the district court's holding that the Fund failed to prove that Perrelle's real estate investments were economically related to his investment in Personnel. The Fund argues that commonly controlled businesses need not be economically related. The district court correctly stated that the legislative history underlying § 1301(b)(1) demonstrates that Congress included that section to prevent withdrawn employers from avoiding liability by fractionalizing their business operations. *See Lafrenz*, 837 F.2d at 894; *Western Conference of Teamsters Pension Trust Fund v. H.F. Johnson, Inc.*, 830 F.2d 1009, 1013 (9th Cir.1987). The district court reasoned that "if the alleged business had nothing whatsoever to do with the withdrawn corporation, then there is no danger of protecting assets through fractionalized operations, and deeming it a business does not serve to further the purposes of ERISA." Because the district court found that Perrelle's real estate activities had no connection with the operations of Personnel, it found "there was no evidence that these investments should be deemed an attempt to shirk his ERISA obligations by fractionalizing his business operation."

█ We review *de novo* the district court's legal conclusion that the Fund was required to prove that Personnel and Perrelle's real estate activities were related. *Oneida Tribe of Indians v. State of Wisconsin*, 951 F.2d 757, 760 (7th Cir.1991). In *Slotky*, we stated that "there is no requirement that the trades or business under common control be related...." 956 F.2d at 1374; *see also Lafrenz*, 837 F.2d at 895 (§ 1301(b)(1) does not require that commonly controlled businesses be economically related in order to find that an operation is a trade or business); *O'Connor v. DeBolt Transfer, Inc.*, 737 F.Supp. 1430, 1445 (W.D.Pa.1990) (following *Lafrenz*); *Trustees of the Amalgamated Ins. Fund v. Sheldon Hall Clothing, Inc., et al.*, 683 F.Supp. 986, 992 (E.D.Pa.1988) (same), *aff'd*, 862 F.2d 1020 (3rd Cir.1988), *cert. denied*, 490 U.S. 1082, 109 S.Ct. 2104, 104 L.Ed.2d 665 (1989). When it entered summary judgment, the district court did not have the benefit of our statement in *Slotky*. The Fund is correct that § 1301(b)(1) does not require an economic nexus other than common ownership as a prerequisite to withdrawal liability. We hold that to establish withdrawal liability the Fund must only prove that Perrelle engaged in a trade or business.

Additionally Perrelle's leasing activities were related to Personnel because Personnel paid rent to Perrelle for five years. Perrelle used the rent to satisfy the mortgage on the property and claimed a depreciation deduction. Perrelle clearly profited from his arrangement with Personnel. Thus, Perrelle's assertion that his real estate activities were entirely unrelated to Personnel is incorrect. Courts have found such arrangements significant in determining whether an operation is a "trade or business." In *PBGC v. Center City Mo-*

---

**2.** Perrelle did not own 100% of each of the properties in which he invested, but that fact is irrelevant. As the district court noted, the relevant issue is whether Perrelle had a controlling interest in a real estate trade or business.

*tors,* 609 F.Supp. 409 (S.D.Calif.1984), the court found that a sole proprietorship which leased property to another corporation under common control was within the definition of a "trade or business" as used in § 1301(b)(1). *Id.* at 412.

■ As the district court noted, § 1301(b)(1) does not define the phrase "trade or business." That section states only that regulations prescribed under § 1310(b)(1) shall be "consistent and co-extensive with regulations prescribed for similar purposes by the Secretary of the Treasury under § 414(c) of the Internal Revenue Code of 1986. [26 U.S.C. § 414(c)]." Although the phrase "trade or business" appears frequently in the Internal Revenue Code, the Code does not contain a general definition and the Treasury has not issued a regulation which defines the term for general purposes. *See Comm'r of Internal Revenue v. Groetzinger,* 480 U.S. 23, 27, 107 S.Ct. 980, 983, 94 L.Ed.2d 25 (1987). Courts examining the definition of "trade or business" in § 1301(b)(1) have not adopted a particular definition of that phrase, but have instead construed the phrase in accordance with Congress's purpose in enacting that section. *See Lafrenz,* 837 F.2d at 894; *Pension Ben. Guar. Corp. v. Center City Motors,* 609 F.Supp. 409, 412 (D.C.Cal.1984). As the district court stated, § 1301(b)(1) was enacted to prevent employers from avoiding withdrawal liability by fractionalizing their operations. *Lafrenz,* 837 F.2d at 894; *Center City Motors,* 609 F.Supp. at 412.

In *Groetzinger,* the Supreme Court discussed the definition of trade or business under § 162(a) of the Internal Revenue Code. 26 U.S.C. § 162(a). Section 162(a) allows a taxpayer to deduct ordinary and necessary expenses paid or incurred in carrying on a trade or business. The Court stated:

> Of course, not every income producing and profit making endeavor constitutes a trade or business. The income tax law, almost from the beginning, has distinguished between a business or trade, on the one hand, and "transactions entered

into for profit but not connected with ... business or trade," on the other.... *See* Revenue Act of 1916, § 5(a), Fifth, 39 Stat. 759. Congress "distinguished the broad range of income or profit producing activities from those satisfying the narrow category of trade or business." We accept the fact that to be engaged in a trade or business, the taxpayer must be involved in the activity with continuity and regularity and that the taxpayer's primary purpose for engaging in the activity must be for income or profit. Sporadic activity, a hobby, or an amusement diversion does not qualify.

*Id.* 480 U.S. at 35, 107 S.Ct. at 987 (quoting *Whipple v. Commissioner,* 373 U.S. 193, 197, 83 S.Ct. 1168, 1171, 10 L.Ed.2d 288 (1963)). Although the *Groetzinger* court considered a provision of the tax code, we find its definition helpful in distinguishing trades or businesses from purely personal activities or investments.

Next, we review the record evidence concerning Perrelle's real estate transactions to determine if those activities were a trade or business under § 1301(b)(1). In 1984, Perrelle leased six properties. To report that income, he filed a Schedule E ("Income from Supplemental Income") to his income tax return on which he deducted from rents received advertising expenses, mortgage payments, repairs and depreciation expenses. In addition, Perrelle purchased and sold ten properties which he had held less than one year, declaring a net gain after the deduction from income of various expenses and depreciation. He also sold another property which he had held for two years and declared a net gain of $6,461.00. In 1985, Perrelle continued to lease five properties for which he received rents and deducted expenses on his tax return, including depreciation, which he listed on his Schedule E. In that year, Perrelle also sold a building which he had owned for six years and had leased to Personnel until the sale, and declared a gain of $15,413.00. He also purchased and sold three properties which he had held under six months.

In 1986, the year of withdrawal, Perrelle leased three properties for which he report-

ed income and deducted from the rental payments depreciation expense, advertising expense, mortgage payments, and repairs and utilities on his Schedule E. Perrelle sold one property, which he had held and leased for five years, for a gain of $6,187.00, and sold another rental property in which he had a 50% interest, and declared a gain of $5,874.00. In 1987, Perrelle leased and sold another property, declaring a gain of $50,410.00 on the sale. He also declared rental income from the other properties, and claimed deductions for various expenses including depreciation.

Between 1984 and 1987, Perrelle declared rents received on the Schedule E to the tax returns and deducted various expenses associated with leasing property and also deducted depreciation expense and interest/mortgage expenses. Due to the deduction of these expenses, Perrelle typically declared a net loss on his Schedule E, which loss he would then deduct from his income, thus reducing his overall tax liability. Furthermore, when Perrelle sold the buildings he had leased, he declared his gain on Form 4797, "Gain or Loss from Sales or Exchanges of Assets used in a Trade or Business."

The Fund argues that Perrelle treated his real estate activities as a trade or business on his tax returns because he deducted depreciation, advertising and other expenses. The Fund argues that if Perrelle was merely making an investment, as he now claims, he could not have deducted expenses and he would have declared his net gain or loss from disposition of the property on Schedule B—for capital gains—rather than on Form 4797. According to the Fund, by taking advantage of the tax benefits and reporting his real estate transactions as performed as part of a trade or business, Perrelle operated a trade or business under § 1301(b)(1). Perrelle acknowledges that he reported rents from his buildings on Schedule E of his tax return; but he insists that had he engaged in a trade or business he would be required to report the income on Schedule C.

Courts have long held that leasing real estate is a trade or business for the purpose of determining the availability of business deductions under the Internal Revenue Code. *See Alvary v. United States,* 302 F.2d 790, 796 (2nd Cir.1962). In *Alvary,* the Second Circuit stated: "[t]he rental of real estate is a trade or business if the taxpayer-lessor engages in regular or continuous activity in relation to the property ... even if the taxpayer rents only a single piece of real estate." *Id.* at 796 (citations omitted); *see also Beltran v. United States,* 441 F.2d 954, 960 (7th Cir. 1971); *Reiner v. United States,* 222 F.2d 770, 773 (7th Cir.1955).

The district court did not find Perrelle's use of Form 4797 to report sales of his properties to be relevant to whether he engaged in a trade or business because that form is not limited to the sale of trade or business property. The Fund disagrees. It points out that § 167 of the Internal Revenue Code allows deduction of depreciation expenses for property used in a trade or business or property held for the production of income. *See* 26 U.S.C. § 167(a). Thus, the Fund claims that it is clear that Perrelle's real estate was used in a trade or business or that it was held for the production of income.

We agree with the Fund that Perrelle treated his real estate activities as a business to allow him to claim deductions for his expenses, such as advertising, utilities, repairs, and depreciation. In our view, this is strong evidence that Perrelle's real estate activities constituted a trade or business under § 1301(b)(1). We further find that Perrelle's use of Form 4797 and his use of Schedule E instead of Schedule C is not dispositive because he claimed all of the deductions that a similar real estate business would have claimed. The proper characterization of Perrelle's activities for purposes of the Internal Revenue Code, although relevant to our inquiry, does not completely resolve whether Perrelle engaged in a trade or business within the meaning of § 1301(b)(1).

The Fund argues that Perrelle's real estate activities clearly rose to the level of a

trade or business under § 1301(b)(1) because they were regular and continuous and designed to produce income. *See Groetzinger*, 480 U.S. at 35, 107 S.Ct. at 987. Perrelle responds that he could not have supported himself from the income received from his real estate investments. As Perrelle would have it, his activities were merely personal investments similar to the purchase of stocks or bonds.

We agree with the Fund that Perrelle's real estate activities were quite substantial and were designed to produce income. *See Groetzinger*, 480 U.S. at 35, 107 S.Ct. at 987. Even though Perrelle's leasing activity did not produce a net gain after deductions for depreciation, mortgage and other expenses, he received constant benefits from his investments. In fact, he satisfied his mortgages and increased his equity in the various properties and many of his properties appreciated. In addition, Perrelle deducted the operational expenses of maintaining the properties from his income, thus reducing his overall tax obligation. Perrelle's investments in real estate were more than personal investments, such as holding shares of stock or bonds in publicly traded corporations. We conclude that Perrelle's real estate activities rose to the level of a trade or business because they were continuous and regular and designed to produce income. *Cf., Groetzinger*, 480 U.S. at 35, 107 S.Ct. at 987; *see also Lafrenz*, 837 F.2d at 894 (finding that an operation which owned trucks and leased them for profit was a trade or business). The district court's conclusion to the contrary was clearly erroneous.

Our holding is consistent with the decisions of other courts, which have found operations similar to Perrelle's to be trades or businesses under § 1301(b)(1). In *Lafrenz*, the Ninth Circuit found that the leasing of two dump trucks by a husband and wife was an unincorporated business operation and a trade or business under § 1301(b)(1), even though the operation had no employees. 837 F.2d at 895; *see also Central States Southeast and Southwest Areas Pension Fund v. Skyland Leasing*, 691 F.Supp. 6, 11 (W.D.Mich.S.D.1987), *aff'd* 892 F.2d 1043 (6th Cir.1990) (an equip-

ment leasing operation was a trade or business even though it had no employees).

We REVERSE the judgment of the district court and REMAND this case for the entry of summary judgment in favor of the Fund.