In the

# United States Court of Appeals

## For the Seventh Circuit

Nos. 11-3513 & 12-1333

CENTRAL STATES SOUTHEAST AND
SOUTHWEST AREAS PENSION FUND, *et al.*,,

*Plaintiffs-Appellees and*
*Cross-Appellants*,

*v.*

MESSINA PRODUCTS, LLC,
a Michigan limited liability company,

*Defendant-Appellant*,
*and*

STEPHEN MESSINA and FLORENCE
MESSINA,

*Defendants and*
*Cross-Appellees*.

Appeals from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 1:10-cv-00355—**Robert M. Dow, Jr.**, *Judge*.

ARGUED SEPTEMBER 12, 2012—DECIDED FEBRUARY 8, 2013

Before FLAUM, WOOD, and HAMILTON, *Circuit Judges.*

HAMILTON, *Circuit Judge.* When an employer participates in a multiemployer pension plan and then withdraws from the plan with unpaid liabilities, federal law can pierce corporate veils and impose liability on owners and related businesses. These appeals present issues on the scope of such liabilities. Plaintiff Central States, Southeast and Southwest Areas Pension Fund is a multiemployer pension plan within the meaning of the Employee Retirement Income Security Act of 1974 ("ERISA"), as amended by the Multiemployer Pension Plan Amendments Act of 1980 ("MPPAA"), 29 U.S.C. §§ 1381-1461. Messina Trucking, Inc. was a closely-held corporation owned, along with several other closely-held entities, by Stephen and Florence Messina. For several years, Messina Trucking was subject to a collective bargaining agreement that required it to contribute to the Fund for its employees' retirement benefits. In October 2007, however, Messina Trucking permanently ceased to have an obligation to contribute to the Fund, triggering a "complete withdrawal" from the Fund, and incurring nearly $3.1 million in potential withdrawal liability. 29 U.S.C. § 1383.[1]

The Fund sued Stephen and Florence Messina, Messina Trucking, Messina Products, Messina Product Operations LLC, Utica Equipment Co., Washington Lakes, LLC, and

---

[1] Messina Trucking initiated arbitration to challenge the merits of its withdrawal liability. See 29 U.S.C. § 1401(a)(1). That arbitration is pending.

Auburn Supply Co. seeking a declaratory judgment that the named defendants were jointly and severally liable for the withdrawal liability obligation incurred by Messina Trucking under 29 U.S.C. § 1301(b)(1) of the MPPAA as "trades or businesses" under "common control" with Messina Trucking. All parties aside from Stephen and Florence Messina and Messina Products either conceded liability or for various reasons were dismissed from the proceedings.

The Messinas and Messina Products argued that they were not "trades or businesses" under section 1301(b)(1) and thus that they could not be held liable for Messina Trucking's withdrawal. On cross-motions for summary judgment, the district court held that Mr. and Mrs. Messina, who owned and leased several residential properties as well as the property from which Messina Trucking operated, were not engaged in a "trade or business" and thus could not be held liable for Messina Trucking's withdrawal liability. See *Central States, Southeast and Southwest Areas Pension Fund v. Messina Trucking, Inc.*, 821 F. Supp. 2d 1000, 1009 (N.D. Ill. 2011). The district court found that Messina Products, as a formal business organization whose documents showed that its purpose was to generate profit, was a "trade or business" that could be held liable for Messina Trucking's withdrawal liability. *Id*. at 1007. The Fund appeals the portion of the judgment in favor of the Messinas, and Messina Products appeals the portion of the judgment in favor of the Fund. We resolve both appeals in favor of the Fund, affirming in part and revers-

ing in part the district court's judgment, and remanding for further proceedings.[2]

## I.  Commonly Controlled "Trades or Businesses" under the MPPAA

Under ERISA, the Pension Benefit Guaranty Corporation, a government corporation, protects covered employees by insuring their benefits against insolvency or termination of their pension funds. Before the 1980s, ERISA's contingent liability provisions gave employers a perverse incentive to withdraw from financially weak multiemployer plans to avoid liability in the event the plan terminated in the future. The MPPAA amended ERISA to discourage such voluntary withdrawals from multiemployer plans by imposing mandatory liability on all withdrawing employers for their proportionate shares of "unfunded vested benefits." 29 U.S.C. § 1381.

---

[2] Mr. and Mrs. Messina have argued that, in the event of a reversal of the judgment in their favor, the arbitrator must decide whether they were in the control group at the time of the withdrawal. See *Doherty v. Teamsters Pension Trust Fund of Philadelphia*, 16 F.3d 1386, 1390 (3d Cir. 1994); *Central States, Southeast and Southwest Areas Pension Fund v. Slotky*, 956 F.2d 1369, 1373 (7th Cir. 1992). Because the district court found that the Messinas were not operating a "trade or business" and thus were not employers within the control group and subject to liability, it did not address this question. On remand, the district court should address this issue of arbitrability in the first instance.

Not only the withdrawing employer can be held liable. Congress also provided that all "trades or businesses" under "common control" with the withdrawing employer are treated as a single entity for purposes of assessing and collecting withdrawal liability. 29 U.S.C. § 1301(b)(1); *Central States, Southeast and Southwest Areas Pension Fund v. Neiman*, 285 F.3d 587, 594 (7th Cir. 2002). Each trade or business found to be under common control is jointly and severally liable for any withdrawal liability of any other. See *Central States, Southeast and Southwest Areas Pension Fund v. SCOFBP, LLC*, 668 F.3d 873, 876 (7th Cir. 2011), citing *McDougall v. Pioneer Ranch Ltd. Partnership*, 494 F.3d 571, 574 (7th Cir. 2007). The provision's purpose is "to prevent businesses from shirking their ERISA obligations by fractionalizing operations into many separate entities . . . ." *Central States, Southeast and Southwest Areas Pension Fund v. White*, 258 F.3d 636, 644 (7th Cir. 2001), quoting *Board of Trustees of the Western Conference of Teamsters Pension Trust Fund v. H.F. Johnson, Inc.*, 830 F.2d 1009, 1013 (9th Cir. 1987). Because Mr. and Mrs. Messina and Messina Products conceded that they were under "common control" with Messina Trucking, the only issues here are whether the Messinas and Messina Products were involved in a "trade or business" and accordingly can be held jointly and severally liable for Messina Trucking's pension liability.

The phrase "trade or business" is not defined by section 1301(b)(1). To apply the term under the MPPAA, we have adopted the test adopted by the Supreme Court for other tax purposes in *Commissioner of Internal*

*Revenue v. Groetzinger,* 480 U.S. 23, 35 (1987). See *Neiman,* 285 F.3d at 594; *White,* 258 F.3d at 642; *Central States, Southeast and Southwest Areas Pension Fund v. Fulkerson,* 238 F.3d 891, 895 (7th Cir. 2001). The *"Groetzinger* test" requires that for economic activity to be considered the operation of a trade or business the activity must be performed (1) for the primary purpose of income or profit; and (2) with continuity and regularity.

One purpose of the *Groetzinger* test is to distinguish trades or businesses from passive investments, which cannot form a basis for imputing withdrawal liability under section 1301(b)(1). See *Central States, Southeast and Southwest Areas Pension Fund v. Personnel, Inc.,* 974 F.2d 789, 794 (7th Cir. 1992). The question is whether Mr. and Mrs. Messina and Messina Products should be considered "trades or businesses" under this test, or whether their activities are more akin to passive investments. We conclude that the record shows that they are all "trades or businesses" and can be held liable under section 1301(b)(1) for Messina Trucking's withdrawal liability.

II.  *Stephen and Florence Messina*

A.  *Standard of Review*

Ordinarily, we review *de novo* a district court's grant of summary judgment in an ERISA case because the issues involved require statutory interpretation and are issues of law. See *White,* 258 F.3d at 639-40; *Fulkerson,* 238 F.3d at 894. Yet when the only issue before the

district court is the characterization of undisputed sub-sidiary facts, and where a party does not have the right to a jury trial, we have applied the clearly-erroneous standard of review. See *Pioneer Ranch*, 494 F.3d at 575-77; *Personnel*, 974 F.2d at 792; *Central States, Southeast and Southwest Areas Pension Fund v. Slotky*, 956 F.2d 1369, 1373 (7th Cir. 1992).

The Fund argues that its appeal against the Messinas presents pure questions of law and that we should re-solve these questions *de novo*. The Messinas contend that the more forgiving clear error standard should govern because there are no disputed facts, only disputed characterizations of those facts. As we explain below, resolution of the issues in this appeal is not a matter of properly characterizing undisputed facts. It is instead a matter of proper interpretation of the statute and our precedents as applied to undisputed facts. Be-cause these are issues of law, *de novo* review is appro-priate. *Fulkerson*, 238 F.3d at 894.

B. *The Relevant Facts*

When Messina Trucking withdrew from the Fund in October 2007, the Messinas owned at least 80 percent of the stock and ownership interest in each of the Messina entities, including Messina Trucking. Stephen Messina had served as the president of Messina Trucking since its inception in 1955. Florence Messina had served as vice president and secretary since 1964.

Because the ownership, rental, and use of real estate are critical to our decision, we must trace them in some

detail. In 1963, Stephen Messina purchased a parcel of real property located at 6386 Auburn Road in Shelby Township, Michigan ("the Auburn Road Property"). Stephen and Florence Messina have been joint owners of the Auburn Road Property since at least 1971. After he purchased the Auburn Road Property, Stephen Messina demolished the existing building and replaced it with a new one. He then constructed a second building and, over time, several additions to the two buildings. Messina Trucking and a couple of other Messina entities operated out of the Auburn Road Property.

Messina Trucking paid rent to the Messinas for its use of the Auburn Road Property for many years, but it stopped paying rent at some point prior to 2005 due to financial difficulties. There was never any written lease agreement between the Messinas and Messina Trucking, but the practice was that the Messinas paid the property taxes on the property, while Messina Trucking paid for property insurance and utilities. All repairs and maintenance on the Auburn Road Property were performed by employees of Messina Trucking. The other Messina entities that operated from the Auburn Road Property never paid any rent to the Messinas to use the property.

Stephen Messina also owned two properties located at 45245 Merrill Road and 45041 Merrill Road in Utica, Michigan (the "Merrill Road Properties"). 45245 Merrill Road adjoins the Auburn Road Property. Mr. Messina testified that he purchased the properties in part because they were adjacent to the Auburn Road Property, and

that the additional land allowed him to expand a garage on the Auburn Road Property that was used by Messina Trucking, and to permit Messina Trucking to have additional means of ingress to and egress from its operations.

Stephen Messina also stated that he purchased the Merrill Road Properties to generate rental income. At one time Messina Trucking paid rent for its use of the Merrill Road Properties, but again, it stopped paying rent sometime prior to 2005. Two homes were located on the 45245 Merrill Road property. One of the homes was leased to a Messina Trucking employee and his wife pursuant to a written agreement with Stephen Messina. That employee was able to provide additional security for the Messina Trucking facilities on nights on weekends and to care for the guard dog. The second home on the 45245 Merrill Road property also was leased to a residential tenant. A third home located on the 45041 Merrill Road property was leased pursuant to a written agreement.

Either Stephen Messina or his daughter negotiated the terms of the residential leases for the Merrill Road Properties. The rent for the properties was paid on a monthly basis, and either Florence Messina or the Messinas' daughter deposited the rent checks into the Messinas' personal joint bank account. A Messina Trucking employee monitored the rent payments to ensure that they were paid on time. The Messinas paid the property taxes and insurance on the Merrill Road Properties. The tenants paid all other utilities aside from water, which was paid by Messina Trucking. Em-

ployees of Messina Trucking took care of the lawns and removed snow at the Merrill Road Properties. The Messina Trucking shop foreman was responsible for maintenance. These Messina Trucking employees were not paid any additional money for their maintenance work on these residential properties owned by Mr. and Mrs. Messina. During the tax years 2005 to 2008, the Messinas reported the rental income from the properties on Schedule E of their federal tax returns, and they deducted expenses for insurance, professional fees, repairs, taxes, and utilities from the rental income.

### C. *Analysis*

The Fund does not seek to hold Mr. and Mrs. Messina liable merely because of their ownership of or positions within Messina Trucking, nor could it. See *White*, 258 F.3d at 640 n.3; see also *Fulkerson*, 238 F.3d at 896 ("Given the prevalence of investing, permitting the holding of investments . . . without more to be considered regular and continuous activity would eviscerate the limitations placed in the text of § 1301(b)(1)."); *Slotky*, 956 F.2d at 1374 ("[T]he purpose of limiting controlled group membership to persons engaged in trades or businesses is to protect the owners of corporations from having to dig into their pockets to make good the withdrawal liability of their corporations."). Instead, the Fund seeks to hold the Messinas liable for operating as a "trade or business" as commercial and residential landlords.

The district court found that the Messinas' rental activities did not amount to a "trade or business" under the two-

part *Groetzinger* test. Considering only the sporadic rental activity undertaken by the Messinas themselves, the district court concluded that their rental activity was not sufficiently continuous and regular to be a trade or business rather than an investment. In rendering its decision, however, the district court did not have the benefit of *Central States, Southeast and Southwest Areas Pension Fund v. SCOFBP, LLC*, 668 F.3d 873 (7th Cir. 2011), issued after the district court's decision. Without *SCOFBP*, and particularly its teaching that renting property to a withdrawing employer is "categorically" a trade or business, the district court did not consider properly the legal implications of the facts that the Messinas permitted Messina Trucking, their closely-held corporation and the withdrawing employer, to operate on the property they owned without a formal written lease and without paying rent for several years. See *SCOFBP*, 668 F.3d at 879. The district court also did not account properly for the property maintenance activities of the Messina Trucking employees, which, without a formal agreement, must be imputed to the Messinas. We therefore reverse the judgment in favor of Mr. and Mrs. Messina.

The district court relied primarily on our decision in *Fulkerson*. See *Messina Trucking*, 821 F. Supp. 2d at 1007-09, citing *Fulkerson*, 238 F.3d 891.[3] The Fulkersons were

---

[3] The district court also relied heavily on *Central States, Southeast and Southwest Areas Pension Fund v. Nagy Ready Mix,*
(continued...)

the only shareholders of Holmes Freight Lines, Inc., a trucking company. They also owned three parcels of land that they leased to Action Express, Inc., a different trucking company that was owned by their sons. Holmes Freight and Action Express were maintained as separate corporations; the Fulkersons owned no interest in and were not involved in the management of Action Express. The written leases under which Action Express leased the Fulkersons' property were so-called "triple net leases" under which the tenant, Action Express, was responsible for most obligations, including maintenance, operating expenses, real estate taxes, and insurance. All the Fulkersons did was collect rent payments and make mortgage payments. When Holmes Freight ceased operations and withdrew from the Fund, the Fund argued that the Fulkersons' leasing activities constituted a "trade or business" and that the Fulkersons could be held liable for Holmes Freight's withdrawal

---

[3] (...continued)
*Inc.*, 2011 WL 3021524 (N.D. Ill. July 22, 2011). Nagy leased his property to Nagy Ready Mix, a closely-held corporation, through a formal triple-net lease under which Nagy Ready Mix was responsible for upkeep of the property. The district court held that Nagy's rental activity more closely resembled investment activity than "trade or business" activity, and found that he could not be held liable for Nagy Ready Mix's withdrawal liability under section 1301(b)(1). See 2011 WL 3021524, at *4-6. The Fund's appeal from the district court's decision in *Nagy* is pending before this court in No. 11-3055. In the meantime, unlike the district court, we do not give *Nagy* persuasive weight.

liability. See *Fulkerson*, 238 F.3d at 893-94. We held otherwise, finding that the Fulkersons' leasing activity did not automatically constitute a "trade or business" under the *Groetzinger* test, and remanded for further development of the record. We explained that, "possession of a property, be it stocks, commodities, leases, or something else, without more is the hallmark of an investment. Thus, mere ownership of a property (as opposed to activities taken with regard to the property) cannot be considered in determining whether conduct is regular or continuous." *Fulkerson*, 238 F.3d at 895-96. Once we removed from consideration the fact that the Fulkersons owned the leased property, all that remained was the fact that Tom Fulkerson spent approximately five hours a year dealing with the leases or the leased properties. This, we found, was insufficient activity to satisfy the requirement in *Groetzinger* that the activity be regular or continuous to be a trade or business. *Id*. at 896.

Likewise, we held in *White,* 258 F.3d 636, that by renting out two residential apartments above their garage, the Whites had not engaged in a "trade or business" sufficient to impose withdrawal liability on them personally when the trucking company owned by Gary White went bankrupt and withdrew from the Fund. Importantly, we found that there was no possibility that the Whites' rental activity was being used to dissipate or fractionalize the withdrawing employer's assets to avoid withdrawal liability. *Id*. at 644. Although the Whites realized some income and tax benefits from the rentals, an important purpose of their ownership of

the rental apartments was the additional security the tenants provided for the Whites' own home. The existence of the apartments had not been a deciding factor in the Whites' decision to purchase their home, and though they performed some maintenance and upkeep on the property, the apartments were appendages of their primary residence and such normal upkeep benefitted them personally. We found that their actions were routine for any homeowner and were not legally significant. *White*, 258 F.3d at 643.

The rental activities we considered in *Fulkerson* and *White* are easily distinguishable from the rental activities conducted by the Messinas. Simply put, neither the Fulkersons nor the Whites rented property to the withdrawing employer itself. The Fulkersons rented property to their sons' separately owned and managed trucking company; the Whites rented their garage apartments to residential tenants.

The Messinas, though, rented their property to their own, closely-held company — Messina Trucking, the withdrawing employer. They also leased residences to individual tenants, but that activity was incidental to the rental activity in favor of Messina Trucking. In *SCOFBP*, we stated explicitly that "leasing property to a withdrawing employer is a 'trade or business' within the meaning of the MPPAA." 668 F.3d at 878, 879 ("Furthermore, we have held that leasing property to a withdrawing employer itself is categorically a trade or business."), citing *Central States, Southeast and Southwest Areas Pension Fund v. Ditello*, 974 F.2d 887, 890 (7th Cir.

1992); see also *Slotky*, 956 F.2d at 1374 (rejecting argument that property owner, who was majority shareholder of withdrawing employer that was operating on the property and sporadically paying rent, was not engaged in a "trade or business" but was merely holding property for withdrawing employer as a trustee). The MPPAA does not impose liability for a withdrawing employer on purely passive investment entities, including those that invest in real estate. But where the real estate is rented to or used by the withdrawing employer and there is common ownership, it is improbable that the rental activity could be deemed a truly passive investment. In such situations, the likelihood that a true purpose and effect of the "lease" is to split up the withdrawing employer's assets is self-evident. We see no reason why that principle should not apply here.

The Messinas make no effort to distinguish *SCOFBP* or its implications. They also fail to cite any appellate authority, and we are aware of none, holding that an individual under common control with a withdrawing employer and who leases property to the withdrawing employer is *not* operating a trade or business. Without authority in support of their position, the Messinas instead attack *SCOFBP*, arguing that it is "inapplicable" and "fails to account for the state of the law in this circuit on such issue." In holding that leasing property to a withdrawing employer is "categorically" a trade or business, *SCOFBP* relied on *Ditello*. The Messinas contend that *Ditello*, and *SCOFBP* by extension, are not good law because instead of relying on *Groetzinger* and its two-part test, they relied instead on the underlying

purpose of the statute — to prevent the fractionalization of assets.

The argument is not persuasive. When *Ditello* was decided, it was not yet settled in our circuit that the *Groetzinger* test is the test for determining whether entities are "trades or businesses" under section 1301(b)(1). There is no more uncertainty; that issue is settled. See *White*, 258 F.3d at 642 (affirming that the *Groetzinger* test is "appropriate" for determining whether an activity is a trade or business for purposes of section 1301(b)(1)); *Fulkerson*, 238 F.3d at 895 (finding that the *Groetzinger* test applies to questions under section 1301(b)(1); test "comports with the common meaning of trade or business" and thus has broad applicability).

Although *Ditello* did not rely on *Groetzinger*, its reasoning remains sound on this point.[4] Its analysis,

---

[4] Another portion of *Ditello* has been abrogated. *Ditello* and *Personnel* were decided within two weeks of each other, and diverged on the question of whether withdrawal liability could be imposed where there was no economic relationship between the withdrawing company and unrelated leasing activities. In *Personnel*, we held that for businesses to be considered under "common control," the businesses did not have to be economically related. Instead, to establish withdrawal liability, the Fund needed to prove only that the defendants engaged in a trade or business. See 974 F.2d at 793. In *Ditello*, however, we stated, "this circuit has never squarely faced the issue of whether businesses must be economically

(continued...)

which was based on the purpose underlying section 1301(b)(1), is congruent with the *Groetzinger* test. *SCOFBP*, in turn, remains sound. Its conclusion that an owner's or related entity's leasing of property to a withdrawing employer was a trade or business is consistent with both the *Groetzinger* test and with the underlying purpose of section 1301(b)(1).

In *White*, we said that there was no possibility that the Whites' rental activity was being used to dissipate or fractionalize the withdrawing employer's assets to avoid withdrawal liability. See 258 F.3d at 644. Here, we must draw the opposite conclusion. Stephen Messina purchased the Auburn Road Property and then the Merrill Road Properties for the benefit of Messina Trucking's operations. There was no formal lease (triple-net or otherwise). Without formal documentation, the inescapable conclusion is that the Messinas' leasing activity was simply an extension of the business operations of Messina Trucking, the withdrawing employer, and was a means to fractionalize Messina Trucking's assets. One way or the other, the Messinas profited from the leasing arrangement. While Messina Trucking was paying rent, they profited directly from the rent payments. When Messina Trucking ceased paying rent, rather than evict

---

[4] (...continued)

related to be considered members of a controlled group of trades or business under section 1301(b)(1), and it remains an open question." 974 F.2d at 890. This discrepancy in our law has been resolved, and is no longer an open question in our circuit. See *Fulkerson*, 238 F.3d at 895 n. 1 (confirming that no economic nexus is required to impose liability).

their tenant, the Messinas continued to receive the tax benefits of their arrangement. They deducted expenses such as insurance, professional fees, repairs, taxes, and utilities from the rental income. And as owners of Messina Trucking, they profited from their decision as landlords to permit Messina Trucking to operate rent-free. In other words, they engaged in their leasing activity "for the primary purpose of income or profit," satisfying the second part of the *Groetzinger* test.

Real estate activity unrelated to business of the withdrawing employer also can be "for the primary purpose of income or profit" where that activity "increases equity, appreciates value, and generates tax deductions that reduce the overall tax burden," even if the activity does not produce a net gain. *SCOFBP*, 668 F.3d at 878, citing *Personnel*, 974 F.2d at 795-96. Accordingly, the fact that the Messinas did not rent exclusively to Messina Trucking, the withdrawing employer, but also incidentally rented a few residences located on the Merrill Road Properties, does not change our analysis.

The first part of the *Groetzinger* test, "continuity and regularity," is also satisfied. We reject the Messinas' contention that the acts undertaken by the Messina Trucking employees to maintain the Messinas' property cannot be imputed to the Messinas. There was no formal lease in place that would have imposed a duty or any other legal obligation on the Messina Trucking employees to take on those responsibilities. Without one, the Messina Trucking employees who maintained the property could not have been doing so for the benefit

of Messina Trucking. They could have been acting only at the behest of and for the benefit of the Messinas, who owned the business and the property. The employees' activities as agents of the Messinas should be imputed to the Messinas. When considering the actions of the Messinas and their agents in total, there is no question that their leasing activities were continuous and regular.

In sum, it is clear that the Messinas' rental activities satisfied the *Groetzinger* test and were a "trade or business." We therefore reverse the district court's judgment in favor of Stephen and Florence Messina.

## III.  *Messina Products*

### A.  *Standard of Review*

We turn now to Messina Products' appeal from the district court's determination that it was operating as a "trade or business." Messina Products asserts that our review of its appeal should be *de novo*.[5] However, because

---

[5] Specifically, Messina Products contends that the district court based its determination on a mistaken finding of fact that Messina Products had employees when it actually did not. Though the district court mentioned Messina Products' supposed employees in its denial of Messina Products' motion to alter or amend, the district court did not rely on this point in reaching its original decision. Even if it had, the only dispute is over the characterization of undisputed facts.
(continued...)

the only issue before the district court was the characterization of undisputed subsidiary facts and no party has the right to a jury trial, we apply the clearly erroneous standard of review. See *Pioneer Ranch*, 494 F.3d at 575; *Personnel*, 974 F.2d at 792; *Slotky*, 956 F.2d at 1373. Our resolution of Messina Products' appeal would remain the same, though, even if we reviewed these issues *de novo*.

B. *The Relevant Facts*

Messina Products was a Michigan limited liability company formed on August 7, 1998, and commonly owned with Messina Trucking. Stephen Messina was the president of Messina Products, while Florence was the vice-president and secretary. The company was governed by an operating agreement stating that the "Members have adopted a business plan for the development of properties and for the production, sale and marketing of gravel for road, subdivision, City and community development, both wholesale and retail."

---

[5] (...continued)
(There is no dispute that the Messinas were corporate officers for Messina Products and that an employee of Messina Trucking handled the bookkeeping and administrative work for Messina Products.) Messina Products also contends that the district court made a legal error in considering its statement of business intent, which predates Messina Trucking's withdrawal from the Fund by several years. As explained in the text, we find no error on that point, legal or otherwise, and clear error review is appropriate.

Vito Palazzolo was the controller for Messina Trucking. He had access to and kept records not only for Messina Trucking but also for the other Messina Entities, including Messina Products. He testified that Messina Products had no employees and owned no real estate. It never sold any goods or performed any services. Its sole asset was a 50% partnership interest in Messina Lombardo, LLC, a company that owned and rented properties. In turn, Messina Lombardo had no employees and was run by Lombardo Management Co. Neither the Messinas nor Messina Products had any ownership interest in Lombardo Management. Every year, Messina Products received a K-1 tax form for LLC income from Messina Lombardo. Palazzolo reviewed the K-1 and forwarded it to the outside tax preparer. Messina Products did not require any additional bookkeeping. In its federal tax returns, Messina Products reported "trade or business" income and stated that its principal business activity was "real estate rental."

C. *Analysis*

Messina Products argued before the district court that it was a passive investment vehicle and thus was not a "trade or business" under the *Groetzinger* test. Again, to be a "trade or business" under *Groetzinger*, the economic activity in question must be performed (1) for the primary purpose of income or profit and (2) with continuity and regularity. *Groetzinger*, 480 U.S. at 35. In deciding MPPAA cases involving withdrawal liability, we have determined certain factors to be particularly relevant to this analysis, including the defendant's

intent in creating the enterprise, how the enterprise is treated for tax purposes, and its legal form. See, *e.g.*, *Pioneer Ranch*, 494 F.3d at 577-78; *Fulkerson*, 238 F.3d at 895; *Personnel*, 974 F.2d at 795. The district court considered these factors and found that Messina Products had continually maintained and operated a real estate rental company. It relied on the fact that Messina Products was formally organized as a business enterprise and had expressed its business purpose in its operating statement and in its tax filings. The district court concluded that Messina Products operated as a "trade or business" under the *Groetzinger* test and thus could be held liable for Messina Trucking's withdrawal liability.

Messina Products disagrees, arguing that it had no employees, owned no real estate or assets aside from its interest in Messina Lombardo, and did not engage in regular business activity. It attempts to characterize itself as a passive investment vehicle, akin to the passive, triple-net lease rental activity we considered in *Fulkerson*, 238 F.3d at 893, 896, and the residential rental activity we considered in *White*, 258 F.3d at 643-44. We disagree.

We have written that it is "highly unlikely" that a formal for-profit business organization would not qualify as a trade or business under the *Groetzinger* test, but our circuit has not adopted a *per se* rule that formal, for-profit entities should always be considered "trades or businesses." *SCOFBP*, 668 F.3d at 878. Nevertheless, we explained in *Pioneer Ranch* that "a defendant's stated intention of forming a business is highly relevant, because it constitutes a declaration against interest."

*Pioneer Ranch*, 494 F.3d at 577-78. Accordingly, the district court appropriately took note of the Messina Products operating agreement stating that the "Members have adopted a business plan for the development of properties and for the production, sale and marketing of gravel for road, subdivision, City and community development, both wholesale and retail." As we did in *Pioneer Ranch*, and as the district court did here, we find this evidence "highly relevant." *Messina Trucking*, 821 F. Supp. 2d at 1006, citing *Pioneer Ranch,* 494 F.3d at 577-78. The fact that Messina Products filed a Form 1065 tax return for "trade or business income" and listed on that return that its principal business activity was "real estate rental" is also "strong evidence" that Messina Products was a trade or business. See *Personnel*, 974 F.2d at 795. And the activities, although minimal, were conducted with sufficient continuity and regularity to satisfy the *Groetzinger* test, particularly where they were done under the auspices of a formal, for-profit organization.

We reject Messina Products' argument that we should not consider the operating agreement because it was written several years before Messina Trucking's withdrawal. Messina Products cites for support *IUE AFL-CIO Pension Fund v. Barker & Williamson, Inc.*, 788 F.2d 118, 125-126 (3d Cir. 1986), but that case decided a different issue, holding that whether organizations are under "common control" is determined as of the date of the withdrawal. Also, Messina Products' argument ignores the fact that when conducting the *Groetzinger* analysis, we routinely consult an entity's documentary evidence and other activities that necessarily predate the with-

drawal. See, *e.g.*, *Pioneer Ranch*, 494 F.3d at 577-78 (relying on decade-old partnership agreement and defendant's tax returns over years preceding withdrawal); *White*, 258 F.3d at 643-44 (considering 32 years of defendants' rental history and tax returns); *Fulkerson*, 238 F.3d at 895-97 (considering defendant's leasing activities over ten years).

If the evidence were otherwise — if, for example, Messina Products had amended its operating agreement to reflect an intent to discontinue business operations and to operate as a passive investment vehicle, or had filed tax documents suggesting that it had only an investment purpose or that it had earned only investment income — we could not ignore such evidence simply because it preceded the withdrawal. In this case, however, Messina Products' operating agreement was never amended in a manner that could suggest that Messina Products had ceased its business operations and was instead an investment vehicle, and it consistently filed its tax returns asserting a business purpose and listing business income. It was entirely appropriate for the district court to take these documents at face value. With regard to Messina Products, therefore, we find no error and affirm the district court.

The judgment of the district court is affirmed with regard to Messina Products and reversed with regard to Stephen and Florence Messina, and the case is remanded for further proceedings consistent with this opinion.